# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC.<br>and<br>CHARLES RIVER WATERSHED ASSOCIATION, INC.<br><br>       Plaintiffs,<br><br>v.<br><br>Michael S. REGAN, in his official capacity as Administrator of the<br>U.S. Environmental Protection Agency,<br>David CASH, in his official capacity as Regional Administrator for Region I of the U.S. Environmental Protection Agency,<br>and<br>U.S. ENVIRONMENTAL PROTECTION AGENCY,<br><br>       Defendants. | Case No. 22-11863 |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs Conservation Law Foundation, Inc. ("CLF") and Charles River Watershed Association, Inc. ("CRWA") respectfully submit this Memorandum in Opposition to Defendants' Motion to Dismiss and requests that this Court deny the Motion in its entirety.

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 1

LEGAL STANDARD ....................................................................................................... 2

ARGUMENT ................................................................................................................... 3

    I.    PLAINTIFFS HAVE STANDING BECAUSE DEFENDANTS' DELAY WORSENS WATER QUALITY IN THE THREE RIVERS THAT PLAINTIFFS' MEMBERS REGULARLY VISIT, AND THIS COURT CAN PROVIDE REDRESS BY REQUIRING DEFENDANTS TO PUBLISH A DRAFT RDA PERMIT. .................................... 3

        A.    Plaintiffs Suffer Procedural Injury Because RDA Permitting Procedures Are Designed to Reduce Stormwater Pollution and Protect Plaintiffs' Members' Aesthetic, Recreational, and Economic Interests in the Three Rivers. ...................................... 4

        B.    Plaintiffs' Members' Injuries Are Fairly Traceable to Defendants' Violations, and a Court Order Compelling Defendants to Publish Draft Permits Would Ensure Reductions in Stormwater Pollution. ........................................................................................ 6

    II.    PLAINTIFFS ADEQUATELY PLEAD CLEAN WATER ACT CLAIMS. .................... 7

        A.    Once Defendants Exercise RDA and Decide to Issue General Permits, the CWA Imposes a Mandatory Duty to Publish Draft RDA Permits. .................................... 7

            1.    CWA regulations can create mandatory duties enforceable under the CWA citizen suit provision. ...................................................................................................... 11

            2.    A mandatory duty can be inferred from date-certain deadlines that come before and/or after the duty at issue. ...................................................................................... 13

        B.    Plaintiffs Complied with CWA Notice Requirements Because for Nearly Four Years, Defendants Had Actual Knowledge of Their Unlawful Conduct. ....................... 14

        C.    The Citizen Suit Provision Gives Rise to Plaintiffs' Claim and Grants This Court Subject Matter Jurisdiction; Section 1369(b)(1)(F) Does Not Apply. ................................. 17

    III.    Plaintiffs Adequately Plead Administrative Procedure Act Claims. .............................. 20

        A.    The *TRAC* Factors Demonstrate That Defendants' Delay in Issuing Permits is Unreasonable—Especially Because Human Health Is at Stake. ......................... 20

        B.    Defendants Treat the Charles Mystic, and Neponset Rivers Differently from Similarly Situated Designations, Which is Arbitrary and Capricious. ................................. 24

REQUEST FOR ORAL ARGUMENT ........................................................................ 25

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Adams Fruit Co. v. Barrett*,
   494 U.S. 638 (1990) ................................................................................... 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................... 2

*Biden v. Texas*,
   597 U.S. ——, 142 S. Ct. 2528 (2022) .................................................... 24

*Blue Water Baltimore, Inc. v. Pruitt*,
   2018 WL 704847 (D. Md. Feb. 5, 2018) ................................................ 18

*Blue Water Baltimore, Inc. v. Wheeler*,
   2019 WL 1317087 (D. Md. Mar. 22, 2019) .............................................. 8

*Brito v. Garland*,
   22 F.4th 240 (1st Cir. 2021) ...................................................................... 4

*Care v. EOA*, No. C 12-03987 JSW,
   2013 WL 6327530, (N.D. Cal. Dec. 3, 2013) ........................................ 12

*Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth.*,
   4 F.4th 63 (1st Cir. 2021) ................................................................... 14, 15

*Citizens of Karst, Inc. v. U.S. Army Corps of Eng'rs*,
   160 F. Supp. 3d 451 (D.P.R. 2016) .................................................... 4, 7

*City of Chicago v. Fulton*,
   592 U.S. ——, 141 S. Ct. 585 (2021) ..................................................... 14

*City of Pittsfield v. EPA*,
   614 F.3d 7 (1st Cir. 2010) ........................................................................ 18

*Comm'r of Internal Revenue v. Lundy*,
   516 U.S. 235 (1996) ................................................................................. 11

*Crown Simpson*,
   445 U.S. 193 (1980) ................................................................................. 19

*Cty. of L.A. v. Shalala*,
   192 F.3d 1005 (D.C. Cir. 1999) .............................................................. 25

*EPA v. California ex rel. State Water Res. Ctrl. Bd.*,
   426 U.S. 200 (1976) ................................................................................... 8

*CLF v. EPA*,
   223 F. Supp. 3d 124 (D. Mass. 2017) ............................................... 8, 24

*CLF v. Pruitt*,
   881 F.3d 24 (1st Cir. 2018). .............................................................. 8, 24

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................................... 4

*Garcia v. Cecos Int'l*,
   761 F.2d 76 (1st Cir. 1985) ..................................................................... 15

*Gilbert v. City of Chicopee*,
   915 F.3d 74 (1st Cir. 2019) ....................................................................... 2

*Gonzalez v. United States*,
284 F.3d 281 (1st Cir. 2002) ............................................................... 3
*Gundy v. United States*,
588 U.S. ——, 139 S. Ct. 2116 (2019) ................................................. 8
*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987) ............................................................................... 3
*Hallstrom v. Tillamook Cty.*,
493 U.S. 20 (1989) ............................................................................. 15
*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ............................................................................. 3
*Idaho Conservation League v. Browner*,
968 F. Supp. 546 (W.D. Wash. 1997) ................................................ 23
*Idaho Conservation League, Inc. v. Russell*,
946 F.2d 717 (9th Cir. 1991) ............................................................. 13
*In re a Cmty. Voice*,
878 F.3d 779 (9th Cir. 2017) ............................................................. 21
*In re Am. Rivers & Idaho Rivers United*,
372 F.3d 413 (D.C. Cir. 2004) ............................................. 21, 22, 23
*In re Curran*,
855 F.3d 19 (1st Cir. 2017) ................................................................. 2
*In re Monroe Commc'ns Corp.*,
840 F.2d 942 (D.C. Cir. 1988) ........................................................... 21
*In re NRDC*,
956 F.3d 1134 (9th Cir. 2020) ........................................................... 13
*In re Pesticide Action Network N. Am.*,
798 F.3d 809 (9th Cir. 2015) ............................................... 21, 22, 23
*In re Sierra Club, Inc.*,
2013 WL 1955877 (1st Cir. May 8, 2013) ......................................... 20
*Katz v. Pershing, LLC*,
672 F.3d 64 (1st Cir. 2012) ................................................................. 3
*Kinuthia v. Biden*,
2022 WL 17653503 (D. Mass. Nov. 9, 2022) .................................... 21
*L.A. Waterkeeper v. Pruitt*,
320 F. Supp. 3d 1115 (C.D. Cal. 2018) .................................. 8, 22, 25
*L.A. Waterkeeper v. Pruitt*,
2017 WL 8288040 (C.D. Cal. Nov. 2, 2017) ...................................... 18
*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ......................................................................... 4, 6
*Maine v. Thomas*,
690 F. Supp. 1106 (D. Me. 1998) ................................................ 12, 13
*Maine v. Thomas*,
874 F.2d 883 (1st Cir. 1989) ............................................................. 12
*Massachusetts v. EPA*,
549 U.S. 497 (2007) ............................................................................. 7
*Millay v. Maine Dep't of Lab., Bureau of Rehab., Div. for Blind & Visually Impaired*,
762 F.3d 152 (1st Cir. 2014) ............................................................... 9

*Motor Vehicle Mfrs. Ass'n of U.S. Inc., v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................ 25

*Murphy v. Smith*,
583 U.S. —, 138 S. Ct. 784 (2018) ......................................................... 8

*Nat'l Ass'n of Mfrs. v. Dep't of*,
583 U.S. —, 138 S. Ct. 617 (2018) ................................................... 18, 19

*Nat'l Wildlife Fed. v. Browner*,
127 F.3d 1126 (D.C. Cir. 1997) ......................................................... 13, 14

*Norton v. S. Utah Wilderness*,
542 U.S. 55 (2004) ........................................................................... 11, 20

*NRDC v. EPA*,
542 F.3d 1235 (9th Cir. 2008) ............................................................. 6, 7

*Nulankeyutmonen Nkihtaqmikon v. Impson*,
503 F.3d 18 (1st Cir. 2007) ............................................................. 4, 6, 7

*Nw. Env't. Advocates. v. EPA*,
2022 WL 1001777 (D. Or. Apr. 4, 2022) ................................................ 11

*Nw. Env't Advocates v. EPA*,
268 F. Supp. 2d 1255 (D. Or. 2003) ...................................................... 13

*Nw. Env't Advocates v. EPA*,
537 F.3d 1006 (9th Cir. 2008) .............................................................. 18

*Nw. Env't Advocates v. EPA*,
549 F. Supp. 3d 1218 (D. Idaho 2021) .................................................. 13

*Paolino v. JF Realty, LLC*,
710 F.3d 31 (1st Cir. 2013) ....................................................... 15, 17, 18

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Hercules, Inc.*,
50 F.3d 1239 (3d Cir. 1995) ............................................................ 15, 17

*Raymond Proffitt Found. v. EPA*,
930 F. Supp. 1088 (E.D. Pa. 1996) ............................................... 9, 13, 14

*S. Cal. All. of Publicly Owned Treatment Works v. EPA*,
853 F.3d 1076 (9th Cir. 2017) .............................................................. 19

*Sandoz, Inc. v. Leavitt*,
427 F. Supp. 2d 29 (D.D.C. 2006) ........................................................ 23

*Save Our Sound Fisheries Ass'n v. Callaway*,
429 F. Supp. 1136 (D.R.I. 1977) ..................................................... 15, 16

*Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*,
674 F.3d 97 (1st Cir. 2012) .................................................................. 11

*Sierra Club v. Johnson*,
500 F. Supp. 2d 936 (N.D. Ill. 2007) ...................................................... 9

*Sierra Club v. Leavitt*,
355 F. Supp. 2d 544 (D.D.C. 2005) ....................................................... 12

*Sierra Club v. Thomas*,
828 F.2d 783 (D.C. Cir. 1987) .............................................................. 14

*Sig Sauer, Inc. v. Brandon*,
826 F.3d 598 (1st Cir. 2016) ................................................................ 24

*Stone v. INS*,
514 U.S. 386 (1995) ............................................................................ 18

iv

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  980 F.3d 157 (1st Cir. 2020) ................................................................. 3
*Telecomms. Rsch. & Action Ctr. v. FCC (TRAC)*,
  750 F.2d 70, 80 (D.C. Cir. 1984)........................................................Passim
*Union of Concerned Scientists v. Wheeler*,
  954 F.3d 11 (1st Cir. 2020) ................................................................. 8
*Welch Foods Inc. v. Borough of N. E.*, No.,
  2001 WL 311204 (W.D. Pa. Feb. 6, 2001)............................................ 11
*Westar Energy, Inc. v. Fed. Energy Reg. Comm'n*,
  473 F.3d 1239 (D.C. Cir. 2007)........................................................... 25
*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013)............................................................. 4

## Statutes

5 U.S.C. § 555(b) ....................................................................................... 21
5 U.S.C. § 701 ............................................................................................ 21
5 U.S.C. § 706 ............................................................................................ 20
28 U.S.C. § 2342(1).................................................................................... 20
33 U.S.C. §1365 ....................................................................................Passim
33 U.S.C. § 1251 ............................................................................... 1, 10, 12
33 U.S.C. § 1311 ................................................................................... 8, 10
33 U.S.C. § 1313 ........................................................................................ 12
33 U.S.C. § 1319 ........................................................................................ 25
33 U.S.C. § 1342 .......................................................................................... 2
33 U.S.C. § 1369 ....................................................................................Passim
42 U.S.C. § 7604 ........................................................................................ 14
47 U.S.C. § 402 .......................................................................................... 20

## Regulations

40 C.F.R. Pts. 403–471 .............................................................................. 12
40 C.F.R. § 19.4 ........................................................................................ 25
40 C.F.R. § 122.26................................................................................Passim
40 C.F.R. § 124.3 ......................................................................................... 9
40 C.F.R. § 124.52 ..................................................................................... 24
40 C.F.R. § 124.6 ......................................................................................... 9
40 C.F.R. § 124.10 ..................................................................................... 25
40 C.F.R. § 124.11 ..................................................................................... 25
40 C.F.R § 135.3 ........................................................................................ 14

## INTRODUCTION

Every day, unregulated toxic pollutants drain into the Charles, Mystic, and Neponset Rivers ("the Three Rivers"), sickening people and choking out aquatic life. Yet for four years, Defendants[1] have delayed and avoided their duties under the Clean Water Act to take protective action: they have failed to engage in the permitting process (e.g., publishing a draft permit) to regulate stormwater pollution in these waters. Despite recognizing the need for pollution-reducing permits and working on permitting scenarios for more than three years, Defendants still have not published a single draft permit. Plaintiffs now seek to compel Defendants to timely issue pollution-reducing permits to protect three of this region's vital rivers under the Clean Water Act citizen suit provision and alternatively, under the Administrative Procedure Act.

## BACKGROUND

Congress enacted the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, to protect the "integrity of the Nation's waters" and ensure such waters are swimmable and fishable. 33 U.S.C. § 1251(a). To accomplish this goal, the Act prohibits pollutant discharges without a permit under the National Pollutant Discharge Elimination System ("NPDES"). *Id.* §§ 1311(a), 1342. These permits include "water quality standards" designed to reduce pollution and support the waterway's uses. *Id.* § 1313. The home state determines those uses. *Id.* For example, Massachusetts determined that the Three Rivers are used for recreation and wildlife habitat. Compl. ¶¶ 36–39. But unregulated stormwater discharges (untreated, polluted runoff from rainfall or snowmelt) impair the Three Rivers and render them unfit for their uses. *Id.* ¶¶ 40–43.

Congress authorized EPA to regulate certain stormwater discharges with permits if EPA determines that: (1) "storm water controls are needed for the discharge based on wasteload

---

[1] "Defendants" means Defendant Michael S. Regan, Defendant David Cash, and Defendant EPA.

allocations that are part of 'total maximum daily loads' (TMDLs) that address the pollutant(s) of concern"; or (2) "the discharge, or category of discharges within a geographic area, contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." *Id.* § 1342(p)(2)(E); 40 C.F.R. § 122.26(a)(9)(i)(C)–(D). This authority is EPA's Residual Designation Authority ("RDA"). And this authority is especially important since stormwater discharges are usually exempt from permitting requirements. 33 U.S.C. § 1342(p).

In 2019 and 2020, Plaintiffs petitioned Defendants to exercise their RDA and address the harmful stormwater discharges entering the Three Rivers. Compl. ¶¶ 78, 90, 99. Since submitting the RDA petitions, over the past three years, Plaintiffs have discussed the permitting timeline with Defendants while Defendants worked on permitting scenarios and held meetings with stakeholders about the potential permits. Ex. 1 ¶ 5–9 (Govern Decl.); ECF No. 6-1 ¶ 15. On July 14, 2022, Plaintiffs sent Defendants notice of intent to file suit and filed their Complaint on November 2, 2022. ECF No. 1. On September 14, 2022, EPA exercised its RDA over the Three Rivers (the "Designation"). ECF No. 19-1. But to this day, there are no RDA stormwater pollution permits for the Three Rivers.

## **LEGAL STANDARD**

When considering a 12(b)(6) motion to dismiss for failure to state a claim, a court must "accept[] all well-pled facts in the complaint as true, and draw[] all reasonable inferences in favor of the plaintiff." *Gilbert v. City of Chicopee*, 915 F.3d 74, 80 (1st Cir. 2019). A complaint will survive a 12(b)(6) motion if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "'[D]etailed factual allegations'" are not required. *In re Curran*, 855 F.3d 19, 25 (1st Cir. 2017) (quoting *Twombly*, 550 U.S. at 555).

In considering a motion to dismiss for lack of standing under Rule 12(b)(1), the Court "accept[s] as true all well-pleaded factual averments in the plaintiff's . . . complaint and indulge[s] all reasonable inferences therefrom in his favor." *Katz v. Pershing, LLC*, 672 F.3d 64, 70 (1st Cir. 2012) (quotations omitted). The Court may also consider material outside the pleadings, such as affidavits, to aid in its determination. *Gonzalez v. United States*, 284 F.3d 281, 287–88 (1st Cir. 2002). "[A] suit will not be dismissed for lack of standing if there are sufficient allegations of fact . . . in the complaint or supporting affidavits." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 65 (1987) (quotations omitted).

## ARGUMENT

Plaintiffs' suit must proceed because Plaintiffs: (1) have standing; (2) adequately plead Clean Water Act ("CWA") claims; and (3) adequately plead Administrative Procedure Act claims. Plaintiffs' CWA claims are plausible because Defendants violated their mandatory duties, had proper notice of their unlawful conduct, and are subject to this Court's jurisdiction under the CWA citizen suit provision. Alternatively, Plaintiffs' APA claims are plausible because Defendants' inaction constitutes unreasonable delay and is arbitrary and capricious.

**I.   PLAINTIFFS HAVE STANDING BECAUSE DEFENDANTS' DELAY WORSENS WATER QUALITY IN THE THREE RIVERS THAT PLAINTIFFS' MEMBERS REGULARLY VISIT, AND THIS COURT CAN PROVIDE REDRESS BY REQUIRING DEFENDANTS TO PUBLISH A DRAFT RDA PERMIT.**

For an association to have standing, the association must show, among other things, that "its members would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157, 183 (1st Cir. 2020).[2] To establish standing, plaintiffs must show: "1) that they have suffered an injury in fact, 2) that the injury is fairly

---

[2] Defendants do not dispute the other elements of associational standing. Mot. at 7–8.

3

traceable to the [defendant's] allegedly unlawful actions, and 3) that 'it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 26 (1st Cir. 2007) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

In cases of procedural injury, plaintiffs receive "special" and "relaxed" treatment for standing purposes. *Id.* at 27; *Brito v. Garland*, 22 F.4th 240, 253 (1st Cir. 2021). Procedural injury is met by showing that the agency's procedures are "designed to protect some threatened concrete interest." *Impson*, 503 F.3d at 27. And when plaintiffs allege procedural injury, they meet standing "'without meeting all the normal standards for redressability and immediacy.'" *Id.* Here, Plaintiffs have associational standing because their members are procedurally harmed by Defendants' failure to issue permits to protect the waters that their members enjoy.

### A. Plaintiffs Suffer Procedural Injury Because RDA Permitting Procedures Are Designed to Reduce Stormwater Pollution and Protect Plaintiffs' Members' Aesthetic, Recreational, and Economic Interests in the Three Rivers.

Procedural injury is met by showing that the agency failed to comply with a procedure that is "designed to protect some threatened concrete interest." *Impson*, 503 F.3d at 27; *see also WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (holding that procedural injuries must be "tied to [] concrete aesthetic and recreational interests"); *Citizens of Karst, Inc. v. U.S. Army Corps of Eng'rs*, 160 F. Supp. 3d 451, 456 (D.P.R. 2016) (finding procedural injury when plaintiff resided close to a potential flooding site and agency failed to comply with CWA notice and comment procedures related to flooding dangers). In CWA cases, concrete interests include recreational, aesthetic, and economic interests in the relevant body of water. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183–84 (2000).

Here, Plaintiffs' members ("Members") have suffered a procedural injury because Defendants have delayed the permitting procedures designed to protect Members' concrete

interests in the Three Rivers. The RDA permitting procedures ensure that Defendants timely and properly issue pollution-reducing permits. 40 C.F.R. §§ 122.26(a)(9)(i)(D), 124.6(d). Defendants' failure to comply with RDA permitting procedures worsens stormwater pollution and harms Members' interests in the Three Rivers.

For example, Members' concrete interests include birdwatching, kayaking, canoeing, sailing, volunteering, fishing, observing wildlife, photography, picnicking, coaching, running, biking, walking, working, and "simply being" at the Three Rivers. Ex. 2 ¶ 7 (McGregor Decl.); Ex. 3 ¶¶ 5–6 (Doldron Decl.); Ex. 4 ¶ 6 (Jacobson Decl.); Ex. 5 ¶¶ 6–8 (Lyons Decl.), Ex. 6 ¶¶ 7–9 (Carter Decl.); Ex. 7 ¶¶ 6, 8–15 (Barlow Decl.); Ex. 8 ¶¶ 5, 15 (McBurney Decl.); Ex. 9 ¶¶ 8, 13 (Ames Decl.). But unregulated stormwater pollution prevents Members from full enjoyment and use of the Three Rivers since they cannot swim, canoe, kayak, fish, row, or walk their pets at the Three Rivers because of the risk of exposure to stormwater toxins. Ex. 2 ¶ 10–11 (McGregor Decl.); Ex. 4 ¶ 7, 11, 15 (Jacobson Decl.); Ex. 5 Lyons Decl. ¶ 12; Ex. 6 Carter Decl. ¶ 12–13; Ex. 7 Barlow Decl. ¶¶ 16–17; Ex. 9 Ames Decl. ¶¶ 8, 16. Malcolm Doldron, head coach of women's rowing at Boston University, coaches athletes who have suffered "infected open wounds after coming into contact with the water" on the Charles, requiring hospital treatment. Ex. 3 ¶ 11 (Doldron Decl.). Mark Jacobson, co-owner of Paddle Boston, is forced to cancel kayaking and paddle boarding reservations when cyanobacteria is in the water. Ex. 4 ¶ 8 (Jacobson Decl.). Jacobson has also seen "stormwater pouring in the Mystic" that is gray, "smelly[,] and contains bigger particles." *Id.* ¶ 12.

Also, rampant growth of invasive aquatic plant life from excess nitrogen and phosphorus interferes with Members' rowing and kayaking, Ex. 7 ¶ 18 (Barlow Decl.), to the point that Doldron fears becoming "entangled in it and not be[ing] able to escape." Ex. 3 ¶ 12 (Doldron

Decl.). Kyle McBurney's "home receives well water, so the health of the [Charles] river affects [his] family's drinking water." Ex. 8 ¶ 6 (McBurney Decl.). For Maria Lyons, improved water quality in the Neponset River watershed is "an environmental justice matter" because community events at Tenean Beach, called "Poor Man's Beach" because of its low-income visitors and visitors of color, bring "different parts of the community [] together," which is easier when the water is "consistently clean[]." Ex. 5 ¶¶ 7, 17 (Lyons Decl.). Therefore, Members suffer procedural injury.

    **B.**    **Plaintiffs' Members' Injuries Are Fairly Traceable to Defendants' Violations, and a Court Order Compelling Defendants to Publish Draft Permits Would Ensure Reductions in Stormwater Pollution.**

In terms of traceability and redressability, the Supreme Court holds that procedural standing allows plaintiff to satisfy standing "'without meeting all the normal standards for redressability and immediacy.'" *Impson*, 503 F.3d at 27 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)). For example, standing is met in a lawsuit regarding an agency's failure to prepare an environmental impact statement even though the plaintiff "cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Lujan v*, 504 U.S. at 572 n.7. *See NRDC v. EPA*, 542 F.3d 1235, 1246 (9th Cir. 2008) ("Plaintiffs can satisfy the 'traceability' and 'redressability' factors by showing that the type of storm water discharge causing their injury is that which [certain regulations] aim to address, and that [those regulations] are likely to reduce the risk of the pollution causing their injury.").

Here, the element of traceability is met. Members' procedural injuries are fairly traceable to Defendants' failure to publish draft permits because the draft permit is a necessary legal step before the final permit. Without a draft permit, Defendants cannot issue the final permits that reduce pollution and alleviate Members' injuries. Just like *NRDC v. EPA*, stormwater discharges

cause Members' injuries that a permit will redress since the permit will reduce stormwater pollution.

Members' injuries are also redressable. Redressability is met by showing that if the agency complies with the required procedure, there is a chance of protecting the plaintiff's concrete interest. *See Impson*, 503 F.3d at 28; *Citizens of Karst*, 160 F. Supp. at 457.

Here, an order compelling Defendants to begin the RDA permitting process would put Defendants on course to issuing the pollution-limiting permits that protect Members' interests in the Three Rivers. Defendants' argument that Plaintiffs lack standing because a draft permit itself "regulates nothing" ignores the obvious sequence of events. Mot. at 10. A draft permit must precede a final permit, which will reduce stormwater pollution in the Three Rivers and redress Members' injuries. Defendants' conception of redressability is impermissibly narrow since "[a]ll that is necessary is [for Plaintiffs] to show that the procedural step was connected to the substantive result." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (quotations omitted). Therefore, Plaintiffs have standing.

## II.   PLAINTIFFS ADEQUATELY PLEAD CLEAN WATER ACT CLAIMS.

Plaintiffs plead plausible CWA claims because: (1) Defendants failed to perform mandatory duties; (2) Plaintiffs gave Defendants notice; and (3) the CWA citizen suit's jurisdictional grant applies.

### A.   Once Defendants Exercise RDA and Decide to Issue General Permits, the CWA Imposes a Mandatory Duty to Publish Draft RDA Permits.

The CWA citizen suit allows Plaintiffs to sue Defendants for failing to "perform any act or duty under this chapter which is not discretionary," i.e., mandatory. 33 U.S.C. § 1365(a)(2). Determining whether EPA's duty to publish draft permits is mandatory is a "holistic endeavor,"

informed by looking at "text in context, along with purpose and history." *Gundy v. United States*, 588 U.S. ⸺, 139 S. Ct. 2116, 2126 (2019).

When RDA is exercised, the CWA leaves no discretion regarding whether to issue permits. 33 U.S.C. § 1311(a) (prohibiting discharges without a permit); *see EPA v. California ex rel. State Water Res. Ctrl. Bd.*, 426 U.S. 200, 205 (1976). The statutory text is replete with "shall" commands, which signals a mandatory duty. *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020); *see also Murphy v. Smith*, 583 U.S. ⸺, 138 S. Ct. 784, 787 (2018) ("The mandatory 'shall' normally creates an obligation impervious to judicial discretion.") (cleaned up). For example, the CWA mandates that once Defendants exercise RDA, permits "shall" apply to designated stormwater discharges. 33 U.S.C. § 1342(p)(2)). The CWA implementing regulations affirm this requirement: "operators shall be required to obtain a NPDES permit" upon Defendants' exercise of RDA. 40 C.F.R. § 122.26(a)(9)(i)(C)–(D).

Indeed, the few cases addressing RDA hold that the CWA "unambiguously requires EPA to engage in the permitting process where it has determined that stormwater discharges contribute to a water quality violation." *L.A. Waterkeeper v. Pruitt*, 320 F. Supp. 3d 1115, 1123 (C.D. Cal. 2018) (citing 33 U.S.C. § 1342(p)(2)(E)); *see also Blue Water Baltimore, Inc. v. Wheeler*, No. CV GLR-17-1253, 2019 WL 1317087, at *3 (D. Md. Mar. 22, 2019). This Court agrees: "EPA . . . created the RDA to retain the flexibility to *require* permits on an ad hoc basis." *CLF v. EPA*, 223 F. Supp. 3d 124, 130 (D. Mass. 2017) (Stearns, J.) (emphasis added), *aff'd sub nom. CLF v. Pruitt*, 881 F.3d 24 (1st Cir. 2018). "[W]here, as here, Congress's call is a clarion one, the courts have no warrant to rewrite a statute in the guise of interpretation." *Millay v. Maine Dep't of Lab., Bureau of Rehab., Div. for Blind & Visually Impaired*, 762 F.3d 152, 157 (1st Cir. 2014) (quotations omitted).

Relatedly, the text of the CWA states if EPA "tentatively decides to issue a NPDES []
general permit, he or she *shall* prepare a draft general permit under paragraph (d) of this section."
40 C.F.R. § 124.6(c) (emphasis added). The CWA goes on to state that Defendants "*shall*
prepare a draft permit" that contains certain information, including applicable pollutant limits
and monitoring requirements. *Id.* § 124.6(d) (emphasis added). Also, draft permits prepared by
Defendants "*shall* be . . . made available for public comment." *Id.* § 124.6(e) (emphasis added).
Rife with the term "shall," the RDA provisions in the CWA impose a mandatory duty on
Defendants to publish draft permits when it exercises its RDA (Count 2). Compl. ¶¶ 113–19.

Defendants' argument that there are only "target dates for EPA's draft permit process"
fails because the cited regulation does not apply to RDA permits. Mot. at 15 (citing 40 C.F.R. §
124.3(g)). Section 40 C.F.R. § 124.3(g) is expressly limited to certain categories of permitting
that are not at issue here.[3]

Additionally, the purpose of the CWA shows that Defendants' duty to issue permits
pursuant to RDA is mandatory. *See Raymond Proffitt Found. v. EPA*, 930 F. Supp. 1088, 1098–
99 (E.D. Pa. 1996) (noting that CWA goals cannot be met if EPA fails to perform a duty that
Congress charged EPA with doing); *Sierra Club v. Johnson*, 500 F. Supp. 2d 936, 941 (N.D. Ill.
2007) (rejecting EPA's interpretation of a duty as discretionary because it would undermine the
Clean Air Act's goal of cleaner air).

Congress enacted the CWA to protect waters so that they are healthy enough to swim and
fish in—activities that Members want to do but cannot because of unregulated stormwater
pollution. 33 U.S.C. §§ 1251(a), 1313. Unfortunately, the CWA's prohibit-or-permit system for

---

[3] 40 C.F.R. § 124.3(g) applies to permit applications for a major new hazardous waste management facility, major
new underground injection wells, major NPDES new source, major NPDES new discharger, and offshore oil and
gas facilities.

pollutants usually exempts stormwater discharges. *Id.* §§ 1311(a), 1342. But the Water Quality Act of 1987 amended the CWA to add RDA to account for certain stormwater discharges and bring them into the prohibit-or-permit system. Pub. L. No. 100-4, 1010 Stat. 7 (Feb. 4, 1987) (codified at 33 U.S.C. § 1342(p)(2)(E)). The change was needed because new studies showed stormwater discharges rendered waterbodies unfit for swimming and fishing, and the existing pollution control programs did little to control stormwater discharges. Ex. 10, Implementation of the Federal Water Pollution Control Act (Nonpoint Pollution and the Areawide Waste Treatment Management Program), (96-21) Before the H. Subcomm. on Oversight & Review of the H. Comm. on Public Works & Transp., 96th Cong. 1–2 (Part A), 542 (Part B) (1979).

In fact, when the House and Senate overrode the presidential veto of the amendments, they cited stronger stormwater pollution control as support. 133 Cong. Rec. H515-06 (daily ed. Feb. 3, 1987) (noting 1987 amendments that will "require controls on surface runoff from city streets" are "designed to strengthen America's effort to clean up the Nation's surface waters and make them suitable for fishing and swimming"); 133 Cong. Rec. S1700-01 (daily ed. Feb. 4, 1987) ("The Water Quality Act . . . for the first time addresses problems like nonpoint sources of pollution which have not been adequately controlled in the past.").

Moreover, Defendants' own rules effecting Congress's intent show that they understood Congress wanted them to act with urgency in issuing permits under their RDA: "Section 402(p)(2)(E) of the CWA authorizes case-by-case designations of storm water discharges for *immediate* permitting." 55 Fed. Reg. 47,990, 47,993 (Nov. 16, 1990) (emphasis added). "EPA believes Congress, in adopting section 402(p), wished to strike a balance between the risks associated with industrial storm water discharges and the burdens of controlling the large number

10

of industrial sources in a *short time frame*." 56 Fed. Reg. 56548, 56550 (Nov. 5, 1991) (emphasis added).

Therefore, the text, context, purpose, and history of the RDA provisions show Defendants have a mandatory duty to issue permits from exercising its RDA. An interpretation that Defendants' duty to issue permits pursuant to RDA is not mandatory would undermine the CWA's purpose since an RDA designation without a pollution-reducing permit is meaningless.

### 1. CWA regulations can create mandatory duties enforceable under the CWA citizen suit provision.

Agencies may be sued for not performing a mandatory duty that comes from regulations because regulations "have the force of law." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004); *see also Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 100 (1st Cir. 2012) ("Regulations can, by themselves . . . impose legal duties."). In fact, the few cases that squarely address the scope of the CWA mandatory duty suit allowing for suits against EPA for failure to perform a "duty under this chapter," hold that "under this chapter" includes nondiscretionary duties "imposed either by statute or regulation." *Nw. Env't. Advocates. v. EPA*, No. 3:21-CV-01136-HZ, 2022 WL 1001777, at *8 (D. Or. Apr. 4, 2022); *see Welch Foods Inc. v. Borough of N. E.*, No. CIV.A. 98-246 ERIE, 2001 WL 311204, at *6 (W.D. Pa. Feb. 6, 2001), *aff'd*, 46 F. App'x 678 (3d Cir. 2002).

Here, in the CWA, Congress repeatedly uses the phrase "under this chapter" to include regulations, and the "normal rule of construction [is] that identical words used in different parts of the same act are intended to have the same meaning." *Comm'r of Internal Revenue v. Lundy*, 516 U.S. 235, 250 (1996) (quotations omitted). In the citizen suit provision, Congress authorizes private parties to sue polluters violating "an effluent standard or limitation under this chapter." 33 U.S.C. §1365(a)(1). "Effluent standard or limitation" includes "a regulation under section

11

1345(d) of this title" and "pretreatment standards under section 1317 of this title," which are found only in regulations. 33 U.S.C. § 1365(a)(1), (f); *see* 40 C.F.R. Pts. 403–471.[4] Section 1313 discusses "water quality standard[s] established under this chapter," which are found in regulations. 33 U.S.C. § 1313(a)(2). Several provisions refer to regulations as a requirement issued "under" the CWA. For example, section 1251 encourages "[p]ublic participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter." *Id.* § 1251(e). And section 1322 defines a "manufacturer" as a one "subject to standards and regulations promulgated under this section." *Id.* § 1322(a)(7). Thus, Defendants' argument that only statutes can create mandatory duties requires a narrow reading of "under this chapter" that conflicts with the CWA. Mot. at 14. Defendants provide no explanation as to why Congress would use the same term in one statute for different meanings.

Also, rather than citing a CWA case to support its statute-only argument, Defendants cite discredited dictum in a Clean Air Act case. Mot. at 13 (citing *Maine v. Thomas*, 874 F.2d 883, 888 n.7 (1st Cir. 1989)). The *Thomas* court applied a two-part test where courts first look at whether agency action is final, and if not, determine whether a mandatory duty exists. 874 F.2d at 886; *Maine v. Thomas*, 690 F. Supp. 1106, 1109 (D. Me. 1998). Because *Thomas* answered "yes" to the first question, there was no need to answer the second. 874 F.2d at 888. Importantly, cases that came after *Thomas* similarly find its dictum unpersuasive. *See, e.g.*, *Sierra Club v. Leavitt*, 355 F. Supp. 2d 544, 554–55 (D.D.C. 2005); *Care v. EOA*, No. C 12-03987 JSW, 2013 WL 6327530, at *2 n.1 (N.D. Cal. Dec. 3, 2013); *Nat'l Wildlife Fed. v. Browner*, 127 F.3d 1126, 1129 n.5 (D.C. Cir. 1997)*.*

---

[4] Because the citizen suit provision unambiguously abrogates sovereign immunity and allows Plaintiffs to sue EPA for failing to perform mandatory duties, there is no need to construe this provision in favor of EPA. Mot. at. 13.

Finally, the "regulatory deadlines, premised on event-specific and technological happenings" at issue in *Thomas* do not exist here. 847 F.2d at 888 n.7. Here, the RDA regulations do not rely on external events; they are triggered by Defendants' Designation. Therefore, the CWA regulations create mandatory duties.

### 2. A mandatory duty can be inferred from date-certain deadlines that come before and/or after the duty at issue.

Several courts hold that the duty need not contain a date-certain deadline to be mandatory under the CWA. *See, e.g.*, *In re NRDC*, 956 F.3d 1134, 1138, 1140 (9th Cir. 2020); *Nw. Env't Advocates v. EPA*, 549 F. Supp. 3d 1218, 1236 (D. Idaho 2021); *Nw. Env't Advocates v. EPA*, 268 F. Supp. 2d 1255, 1260 (D. Or. 2003); *Raymond Proffitt*, 930 F. Supp. at 1100–01.

Furthermore, mandatory "shall" language in combination with date-certain deadlines that come before and/or after the duty at issue are sufficient to find a mandatory duty. *See Idaho Conservation League, Inc. v. Russell*, 946 F.2d 717, 720 (9th Cir. 1991) (holding mandatory language plus a date-certain deadline that came before the duty at issue were sufficient to render a duty mandatory under the CWA).

Here, the CWA, full of mandatory "shalls," crafts a sandwich of date-certain deadlines for actions that come before and after a designation, indicating the urgency of RDA permits. Defendants must respond to RDA petitions in 90 days, and dischargers must apply for RDA permits 180 days after receiving notice of a designation. 40 C.F.R. § 122.26(a)(9)(iii), (f).

Notably, Defendants do not cite any CWA cases when arguing that mandatory duties must contain a date-certain deadline. Instead, Defendants cite an abrogated D.C. Circuit Clean Air Act opinion that acknowledges that deadlines can be "inferrable." Mot. at 12; *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987), *abrogated by statute*, *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 553 n.6 (D.C. Cir. 2015) (citing 42 U.S.C. § 7604(a)). And the D.C.

Circuit itself has expressly left open the question of whether a date-certain deadline is necessary for CWA mandatory duty suits. *Nat'l Wildlife Fed.*, 127 F.3d at 1129 n.6.

In addition, *Sierra Club* construed the Clean Air Act citizen suit that bifurcates mandatory suits and suits for agency action unreasonably delayed—which the CWA does not. 42 U.S.C. § 7604(a); 828 F.2d at 792. To give independent meaning to each provision and avoid reading any provision as superfluous, *Sierra Club* had to designate the CAA mandatory duty suit for violations of date-certain deadlines and the CAA unreasonable delay suit for violations of duties without deadlines. 828 F.3d at 791–92. "The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *City of Chicago v. Fulton*, 592 U.S. ——, 141 S. Ct. 585, 591 (2021). And other courts agree: the "single reason that the *Sierra Club* created the two categories of statutory deadlines was to divide subject matter jurisdiction over allegations of unreasonable delay under the [CAA]." *Raymond Proffitt*, 930 F. Supp. at 1100. As a result, *Raymond* held that because the CWA citizen suit does not have a similar bifurcated structure, "allegations of violations of all mandatory duties, including violations of duties of timeliness based on readily ascertainable inferences, may be the subject of a citizen-suit under § 1365(a)(2)." *Id.* at 1101. Therefore, date-certain deadlines are not necessary for a duty to be mandatory.

### B.  Plaintiffs Complied with CWA Notice Requirements Because for Nearly Four Years, Defendants Had Actual Knowledge of Their Unlawful Conduct.

The CWA citizen suit provision requires plaintiffs to provide notice of their intent to sue sixty days before filing a complaint. 33 U.S.C § 1365(b)(1)(A); 40 C.F.R § 135.3. To determine whether notice is adequate, courts conduct a "'functional, fact-dependent, and case-specific inquiry'" into whether the notice "'allows the putative defendants to identify and remedy the alleged violations.'" *Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth.,* 4 F.4th 63, 76 (1st Cir.

2021) (citing *Paolino v. JF Realty, LLC*, 710 F.3d 31, 34 (1st Cir. 2013)). The inquiry reviews "the nature of the purported violations, the prior regulatory history of the site, and the actions or inactions of the particular defendants." *Paolino*, 710 F.3d at 37. In addition, in the First Circuit, courts hold that constructive notice satisfies notice requirements when the parties' communications provide the defendants actual knowledge of their unlawful conduct. *See, e.g.*, *id.*; *Cebollero-Bertran*, 4 F.4th at 76–77; *Save Our Sound Fisheries Ass'n v. Callaway*, 429 F. Supp. 1136, 1144–45 (D.R.I. 1977).[5]

In the CWA case, *Save Our Sound*, the court held that constructive notice requirements were met because the plaintiffs' communications with the defendants gave the agency actual knowledge of its unlawful conduct. 429 F. Supp. at 1144–45. There, the plaintiffs requested a hearing from the agency on a dredging project because of environmental concerns. *Id.* at 1143. After the agency did not respond for a year and half, the plaintiffs sent the agency a letter asking for an update. *Id.* at 1144. The defendants responded 11 days later, stating the dredging project had been approved. *Id.* The plaintiffs then sent a notice of intent to sue and filed their complaint 6 days later. *Id.* Though the plaintiffs did not wait 60 days (according to the CWA's notice provision) and sent the notice letter less than a week before filing the complaint, the court held that the plaintiffs "constructively satisfied" the CWA notice requirements. *Id.* The court reasoned that the defendants "were aware of the precise violations complained of" because the parties communicated about the agency's conduct at issue in the complaint over one year before the notice letter was sent. *Id.* at 1143–44 & n.11.

---

[5] The case at-bar is distinguished from cases that EPA cites. Mot. at 16–17 (citing *Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 31 (1989) and *Garcia v. Cecos Int'l*, 761 F.2d 76, 80 (1st Cir. 1985)). These cases dealt with a different statute and concerned the *timing* of the notice letter, rather than its *substance*. Courts refuse to apply *Hallstrom* to the CWA. *See Pub. Int. Rsch. Grp. of N.J., Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1249 (3d Cir. 1995), cited favorably by the First Circuit in *Paolino*, 710 F.3d 31.

Here, the regulatory history of RDA permits for the Three Rivers is crucial. For almost four years leading up to the notice letter and the filing of the Complaint, Plaintiffs regularly discussed RDA permits for the Three Rivers and requested updates regarding their issuance. Those communications gave Defendants actual knowledge of their unlawful conduct and how to remedy it. Between August 2019 and July 14, 2022 (when Plaintiffs sent the notice letter), Plaintiffs contacted Defendants 18 times to discuss Defendants' progress on the RDA permits and the timing of permit issuance. Ex. 1 ¶ 5 (Govern Decl.); ECF No. 1-1. Surely, if just a few letters were sufficient for constructive notice in *Save Our Sound*, then Plaintiffs' repeated, sustained conversations with Defendants regarding RDA permits, that provided Defendants with actual knowledge of their unlawful conduct, satisfy CLF's notice requirements.

In fact, Plaintiffs continued to push for RDA permits after Defendants exercised their RDA on September 14, 2022, before filing the Complaint. Ex. 1 ¶ 8 (Govern Decl.) On September 15, 2022, Plaintiffs notified Defendants that they intended to file a complaint unless Defendants agreed to issue draft permits within six months. *Id.* On September 23, 2022, Defendants sent Plaintiffs a letter, confirming they: (1) knew Plaintiffs wanted EPA to "commit" to a timeline for when EPA will "issue a draft NPDES permit for stormwater discharges identified in EPA's 2022 Charles, Mystic, and Neponset River Residual Designation"; and (2) "understand that the Conservation Law Foundation intends to file suit against EPA in federal district court if EPA does not provide such a commitment." *Id.* ¶ 9.[6] EPA cannot now claim it had insufficient notice given its explicit acknowledgment of the basis for Plaintiffs' Complaint.

---

[6] Letter from EPA to CLF Atty. Heather Govern (Sept. 23, 2022), https://www.epa.gov/system/files/documents/2023-03/letter-from-epa-to-conservation-law-foundation-september-23-2022.pdf.

Additionally, Plaintiffs' Notice Letter, ECF No. 1-1, is filled with references to RDA permits, which equipped Defendants with the information necessary to redress their violations and avoid litigation. For example, the Notice Letter explains that Plaintiffs are requesting a determination that certain "stormwater discharges contribute to water quality violations" in the Three Rivers *because then* "CWA permits are required." ECF No. 1-1 at 2. Also, the Notice Letter explains that "if such a determination is made, then the CWA mandates that such stormwater discharges obtain a NPDES permit." *Id.* at 6. Several times, the Notice Letter emphasized that EPA's exercise of RDA triggers "NPDES permitting." *See id.* at 2, 6–7. *See Paolino*, 720 F.3d at 38–39 (holding notice letter was sufficient even though it didn't list the "specific standard or limitation" of the CWA allegedly violated).

Moreover, although the CWA requires plaintiffs to state with "reasonable specificity" the violations that will be alleged in the complaint—they do not require the plaintiffs to "'list every specific aspect or detail of every alleged violation.'" *Paolino*, 710 F.3d at 38 (quoting *Hercules*, 50 F.3d at 1248). Exercise of RDA is not an isolated act but part of an overarching statutory scheme allowing EPA to issue permits for stormwater discharges. *Cf. Pub. Int. Rsch. Grp. of N.J., Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995) (keeping in unnoticed recordkeeping violation claims when only discharge violations were noticed because unnoticed violations were elements of the "same overall episode"). Notably, the purpose of the notice provision is not to "place[] impossible or unnecessary burdens on citizens but rather . . . to require[e] information necessary to give a clear indication of the citizens' intent," which Plaintiffs did here. *Id.* at 37. Therefore, Plaintiffs complied with the CWA notice requirements.

**C.  The Citizen Suit Provision Gives Rise to Plaintiffs' Claim and Grants This Court Subject Matter Jurisdiction; Section 1369(b)(1)(F) Does Not Apply.**

The CWA citizen suit provision allows Plaintiffs to sue Defendants for failing to "perform any act or duty under this chapter which is not discretionary." 33 U.S.C. § 1365(a)(2).[7] Above, Plaintiffs explain that this suit is about Defendants' failure to perform a mandatory duty: Defendants have not issued RDA permits, a mandatory duty triggered by their RDA Designation. Section II.A. In fact, in previous RDA litigation, district courts exercised jurisdiction under 1365(a)(2). *Blue Water Baltimore, Inc. v. Pruitt*, No. CV GLR-17-1253, 2018 WL 704847, at *4–5 (D. Md. Feb. 5, 2018); *L.A. Waterkeeper v. Pruitt*, No. 217-CV-3454-SVW (KSx), 2017 WL 8288040, at *6–7 (C.D. Cal. Nov. 2, 2017).

But EPA incorrectly argues another provision of the CWA applies, Mot. at 10–11 (citing 33 U.S.C. § 1369(b)(1)(F)). Section 1369 confers jurisdiction to the appropriate Circuit Court of Appeal to review six categories of EPA action, including "issuing or denying any permit under section 1342." 33 U.S.C. § 1369(b)(1)(F). Courts narrowly apply § 1369(b)(1)(F) when EPA has already issued a permit or decided not to issue a permit. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. ——, 138 S. Ct. 617, 631 (2018); *City of Pittsfield v. EPA*, 614 F.3d 7, 10 (1st Cir. 2010). Courts "counsel[] against [the] expansive application" of § 1369 because of Congress's deliberate "specificity and precision" in naming discrete categories for original appellate court jurisdiction. *Nw. Env't Advocates v. EPA*, 537 F.3d 1006, 1015 (9th Cir. 2008) (cleaned up).

In *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, the Supreme Court refused to apply § 1369(b)(1)(F) to EPA's actions that are not strictly "permit issuances or denials." 138 S. Ct. at 631. There, EPA argued that its rule on "waters of the United States" ("WOTUS") falls under § 1369(b)(1)(F). *Id.* EPA advocated for the court to apply *Crown Simpson Pulp Co. v. Costle*,

---

[7] Statutory provisions that define the scope of judicial review "are jurisdictional in nature," *Stone v. INS*, 514 U.S. 386, 405 (1995), so the Court owes no deference to EPA's interpretation of the Clean Water Act's jurisdictional grants. *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990).

which held that when "'EPA objects to effluent limitations contained in a state-issued permit, the precise effect of its action is to deny a permit'" so Section 1369(b)(1)(F) applies. 138 S. Ct. at 632 (quoting *Crown Simpson*, 445 U.S. 193, 196 (1980), *superseded by statute*, *S. Cal. All. of Publicly Owned Treatment Works v. EPA*, 853 F.3d 1076, 1084 (9th Cir. 2017)). When *Crown Simpson* was decided, no permits could be issued unless the state revised the permit to remedy EPA's objection. *S. Cal. All.*, 853 F.3d at 1085.

But the *Nat'l Ass'n* Court limited *Crown Simpson*'s holding to its facts and held that § 1369(b)(1)(F) did not apply to the WOTUS rule for two reasons. 138 S. Ct. at 632. First, the Court reasoned that EPA's WOTUS Rule is unlike *Crown Simpson* where EPA vetoed necessary conditions in a state permit. *Id.* Although the WOTUS Rule "define[d] a jurisdictional prerequisite of the EPA's authority to issue or deny a permit, the Rule itself makes no decision whatsoever on individual permit applications." *Id.* at 632. Second, EPA's reading was "atextual," because Congress could have but did not use broader language in its jurisdictional grant, like "EPA actions 'relating to whether a permit is issue or denied,'" or "'establishing the boundaries of EPA's permitting authority.'" *Id.* Since the text was clear, the court declined to "override Congress'[s] considered choice by rewriting the words of the statute." *Id.*

Here, Defendants neither issued nor denied a permit. Instead, Defendants took action that triggered its duty to issue permits, which does not fall under the discrete categories in § 1369(b)(1). Like *Nat'l Ass'n*, because stormwater dischargers at issue here are usually exempt from CWA permits, EPA's Designation defines a jurisdictional prerequisite of its authority to issue permits and itself "makes no decision whatsoever on individual permit applications."

Moreover, Defendants' reliance on *Telecomms. Rsch. & Action Ctr. v. FCC* is misplaced because the case dealt with a jurisdictional grant with language and history much different than §

1369. 750 F.2d 70, 75–76 (D.C. Cir. 1984) (citing 28 U.S.C. § 2342(1), 47 U.S.C. § 402(a)).

Besides, Plaintiffs' requested relief neither relates to "what is required in a NPDES permit" nor

contains "[a]ny discussion of what a NPDES permit entails." Mot. at 12. Plaintiffs are not telling

Defendants *how* to do their job, but merely telling Defendants to *do* their job. And Defendants'

reliance on *In re Sierra Club, Inc.* No. 12-1860, 2013 WL 1955877, at *1 (1st Cir. May 8, 2013)

fares no better. Mot. at 11. The *Sierra Club* opinion is pre-*Nat'l Ass'n*; the court—in one

sentence—concluded it had jurisdiction under § 1369 to compel EPA to *reissue* a permit; and the

opinion did not discuss § 1365. Therefore, this Court has jurisdiction under 33 U.S.C. §

1365(a)(2), the CWA citizen suit provision.

## III.  PLAINTIFFS ADEQUATELY PLEAD ADMINISTRATIVE PROCEDURE ACT CLAIMS.

Under the APA, Defendants' delay in publishing draft permits is unreasonably delayed

and the Agency's differential treatment of the Three Rivers petitions compared to other RDA

petitions is arbitrary and capricious (Counts 4 and 5). Compl. ¶¶ 129–48.

### A.  The *TRAC* Factors Demonstrate That Defendants' Delay in Issuing Permits is Unreasonable—Especially Because Human Health Is at Stake.

The APA authorizes plaintiffs to sue an agency to "compel agency action . . .

unreasonably delayed." 5 U.S.C. § 706(1). As a threshold matter, the agency action that plaintiffs

seek to compel must be mandatory. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004).

To determine unreasonable delay, courts balance several factors, known as the *TRAC* factors:

> (1) how quickly the agency should proceed, which can be gleaned from the "statutory scheme" and congressional indications of speed;
>
> (2) danger to human health is implicated by the delay;
>
> (3) the agency's competing priorities;
>
> (4) the interests prejudiced by the delay; and
>
> (5) whether the agency has treated the complaining party differently than similar situations.

*Kinuthia v. Biden*, No. CV 21-11684-NMG, 2022 WL 17653503, at *4 (D. Mass. Nov. 9, 2022)

(quoting *Telecomms. Rsch. & Action Ctr. v. FCC* (*TRAC*), 750 F.2d 70, 80 (D.C. Cir. 1984)); *see*

*In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 420 (D.C. Cir. 2004).

Here, EPA's delay in performing its mandatory duty[8] of publishing draft permits is

unreasonable under the *TRAC* factors: *First*, the statutory scheme of the CWA shows that, upon

exercising their RDA, Defendants must timely issue permits to regulate stormwater pollution.

*Supra* Section II.A; *In re Monroe Commc'ns Corp.*, 840 F.2d 942, 945 (D.C. Cir. 1988) (noting

agency was "unreasonably slow" in light of "congressional indications" that agency should've

acted faster). And EPA's long history of delaying the promised RDA permit-related steps

demonstrates unreasonableness. Ex. 1 ¶ 5–10 (Govern Decl.); *see In re Pesticide Action Network*

*N. Am.*, 798 F.3d 809, 814 (9th Cir. 2015) (holding EPA unreasonably delayed action after

repeatedly backtracking on promised timelines).

Second, Defendants' delay causes ongoing dangers to human health and the environment.

The *TRAC* factors emphasize that "delays that might be reasonable in the sphere of economic

regulation are less tolerable when human health and welfare are at stake." *TRAC*, 750 F.2d at 80.

Stormwater pollutants from the unregulated dischargers referenced in the Designation lead to

toxic cyanobacteria (blue-green algae) blooms that harm pets and humans, kill fish, cause

ecosystem dead zones, and have been linked to neurodegenerative diseases. Compl. ¶¶ 58–62.

Stormwater pollutants in the Three Rivers also include disease-causing pathogens and diarrhea-

inducing bacteria. *Id.* ¶¶ 62–68. Defendants themselves recognize these dangers:

---

[8] See Section II for a discussion of why EPA's duty to publish draft permits is mandatory. For a court to find unreasonable delay, there need not be a date-certain deadline because the "APA requires agencies to 'conclude a matter presented to it . . . within a reasonable time.'" *In re a Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) (quoting 5 U.S.C. § 555(b) (cleaned up). And similar to the CWA, the APA's focus is on duties that are not discretionary. 5 U.S.C. § 701(a)(2).

- "[C]yanobacteria . . . produce[s] extremely dangerous toxins that have been known to sicken or kill people and animals."
- "When oxygen saturation levels drop below what is needed by fish [due to algae blooms]. . . the waters become host to fish kills, red tides, and shellfish poisoning, events with can pose threats to human health as well."
- "[S]tormwater sources of bacteria from direct runoff . . . need to be reduced to meet in stream water quality standards."

ECF No. 19-1 at 7–8, 10, 12, 14; *see In re Pesticide Action*, 798 F.3d at 814 ("In view of EPA's own assessment of the dangers to human health posed by this pesticide, we have little difficulty concluding it should be compelled to act quickly.").

Third, Defendants mention no other competing priorities in its Motion as a reason for its delay. In exempting all stormwater discharges except for those that EPA specifically designates for permitting to protect water quality, Congress struck a delicate balance that "enable[s] the major contributors of pollutants to be addressed first, and all discharges to be ultimately addressed in a manner which will not completely overwhelm EPA's capabilities." Ex. 11, 132 Cong. Rec. 31954, 31961, 31968, *reprinted in* 2 Cong. Res. Serv., Legislative History of the Water Quality Act of 1987, at 657, 668, 678–79 (1988) (statements of Rep. Roe, Rep. Rowland). And in related RDA cases, courts hold that EPA's RDA decisions must be "grounded" to "whether the stormwater discharges contribute to a violation of water quality standards." *L.A. Waterkeeper v. Pruitt*, 320 F. Supp. 3d 1115, 1125 (C.D. Cal. 2018).

Fourth, Defendants' delay negatively impacts Members' aesthetic, recreational, and economic interests in the Three Rivers, where they bird watch, kayak, canoe, sail, volunteer, observe wildlife, coach, and run, among other activities. *Supra* Section I.A.

Fifth, Defendants treat Plaintiffs and their petitions differently from other RDA permitting situations. *See Am. Rivers & Idaho Rivers*, 372 F.3d at 420 (noting agency's delay was "uncharacteristic of the relatively swift treatment it routinely gives similar petitions");

*Sandoz, Inc. v. Leavitt*, 427 F. Supp. 2d 29, 39 (D.D.C. 2006) (considering other applications that the agency processed while the plaintiff's application languished). EPA's years-long delay is uncharacteristic compared to previous RDA permitting timelines. For example, in 2022, EPA made a preliminary designation for two Los Angeles County watersheds and published draft permits the same day. Compl. ¶¶ 10, 104. In Maine, EPA exercised its RDA for the Long Creek watershed and published draft permits the very next day. *Id.* ¶ 105. *See infra* Section III.B (discussing EPA's differential treatment of RDA as arbitrary and capricious).

Although there is no definite time range for what constitutes unreasonable delay, a "reasonable time for agency action is typically counted in weeks or months, not years." *Am. Rivers & Idaho Rivers*, 372 F.3d at 419. Here, for more than three years, Defendants may have analyzed permit scenarios and met with stakeholders and Plaintiffs, but still are unreasonably delaying permit issuance. Ex. 1 ¶ 6 (Govern Decl.); ECF No. 6-1 ¶ 15. *See In re Pesticide Action*, 798 F.3d at 814 (calculating time EPA took to review a rulemaking petition when considering delay for issuing draft rule). Considering that Defendants had 90 days to respond to Plaintiffs' petitions, their formal exercise of RDA was years late. ECF No. 19-1 at 29 (dated Sept. 14, 2022); 40 C.F.R. § 122.26(f)(5); *see Idaho Conservation League v. Browner*, 968 F. Supp. 546, 549 (W.D. Wash. 1997) (noting compounded delay when EPA delayed step before delayed duty at issue). And now, nine more months have passed.

Moreover, given that Defendants possess information regarding the severe water quality issues and need for permits, this Court indicated that they cannot justify further delay in previous RDA litigation. *CLF v. EPA*, 223 F. Supp. 3d 124, 134 (D. Mass. 2017) (Stearns, J., noting "there is less justification for delay" since EPA had "highly detailed information regarding stormwater discharges, their severe impact on the Charles, and the reductions required from

major land use categories to achieve water quality standards"). Therefore, the *TRAC* factors

conclude that Defendants' delay in issuing draft RDA permits is unreasonable.[9]

**B.      Defendants Treat the Charles Mystic, and Neponset Rivers Differently from Similarly Situated Designations, Which is Arbitrary and Capricious.**

The APA authorizes plaintiffs to sue an agency to "hold unlawful and set aside agency

action" that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). As a threshold matter,

Defendants' Designation must be final agency action to be reviewable under Section 706(2)(A),

which means the action: (1) "marked the consummation of the agency's decisionmaking

process" and (2) "resulted in rights and obligations being determined." *Biden v. Texas*, 597 U.S.

——, 142 S. Ct. 2528, 2533 (2022) (cleaned up). *See Sig Sauer, Inc. v. Brandon*, 826 F.3d 598,

600 n.1 (1st Cir. 2016) (noting agency's designation of a gun's part as a "silencer" is final

agency action because the designation subjected certain gun holders to stringent federal

requirements).

Furthermore, under a "long line of precedent," if an agency treats similarly situated

matters differently, the agency action is arbitrary and capricious. *Cty. of L.A. v. Shalala*, 192 F.3d

1005, 1022 (D.C. Cir. 1999) (citing *Motor Vehicle Mfrs. Ass'n of U.S. Inc., v. State Farm Mut.

Auto. Ins. Co.*, 463 U.S. 29, 57 (1983)); *see Westar Energy, Inc. v. Fed. Energy Reg. Comm'n*,

473 F.3d 1239, 1242–43 (D.C. Cir. 2007) (finding agency action arbitrary and capricious

because agency disallowed one company to submit data but allowed other companies to do so).

---

[9] Plaintiffs also allege that EPA has failed to perform its mandatory duty to notify dischargers of the designation and send an application form and alternatively, unreasonably delayed such action, as alleged in Counts 1 and 3. Compl. ¶¶ 106–12, 120–28. EPA announced general permits but because of its non-committal approach, ECF No. 19-1 at 1 n.3, Plaintiffs maintain these counts because they have procedural standing and EPA has a mandatory duty under 40 C.F.R. § 124.52 enforceable under the CWA and alternatively, delay in notifying discharges is agency action unreasonably delayed under the APA, for the same reasons stated above. Like the duty to publish draft permits, 40 C.F.R. § 124.52 contains the same mandatory "shall" language and the *TRAC* factors come out in favor of finding unreasonable delay. The First Circuit already recognized that EPA's decision to issue individual RDA permits "trigger[s] section 124.52," which "require[s] notice" to discharges. *CLF v. Pruitt*, 881 F.3d 24, 31 (1st Cir. 2018).

Here, Defendants' Designation without permits is arbitrary and capricious. First, the Designation is final agency action because Defendants need not take any more steps to finalize the designation itself. The Designation is one step of multiple in the RDA permitting process; the permit is possible only because of the Designation but will not affect the Designation. Although EPA correctly points out that the question of whether the designation was proper remains open, this window is the notice and comment period for the *permit* as a result of the designation. 40 C.F.R. §§ 124.10, 124.11. Notice and comment is not required to make the designation final. Like *Sig Sauer*, the Designation determined rights and obligations by identifying dischargers that are now subject to federal pollution permits, violations of which can expose dischargers to strict liability of nearly $65,000 per day. 33 U.S.C. §§ 1319(d); 40 C.F.R. § 19.4.

Second, as discussed above in the *TRAC* factors, Defendants treat the RDA permitting process for the Three Rivers differently from past similarly situated RDA permits. The L.A. and Maine RDAs are similarly situated because like here: (1) the public submitted RDA petitions (2) prompting EPA to exercise its RDA, and (3) EPA decided to issue general RDA permits. Compl. ¶¶ 104–05. In fact, the L.A. draft permit is a product of a lawsuit against EPA. *L.A. Waterkeeper v. Pruitt*, 320 F. Supp. 3d 1115 (C.D. Cal. 2018). Thus, Defendants' failure to treat the Three Rivers' RDA like similar RDAs is arbitrary and capricious in violation of the APA.

<u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 7.1(d), Plaintiffs believe that oral argument on the issues raised in Defendants' Motion will assist the Court and respectfully request oral argument.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs request that the Court deny Defendants' Motion to Dismiss in its entirety.

Dated: June 30, 2023

Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.

CHARLES RIVER WATERSHED
ASSOCIATION, INC.

By their attorneys:

*/s/ Heather A. Govern*
Heather A. Govern
BBO No. 688482
Conservation Law Foundation, Inc.
62 Summer Street
Boston, MA 02110
(617) 850-1765
hgovern@clf.org

*/s/ Ameya Gehi*
Ameya Gehi
BBO No. 709194
Conservation Law Foundation, Inc.
62 Summer Street
Boston, MA 02110
(617) 850-1795
agehi@clf.org